UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

DAWNN KAREN MAHULAWDE,

                 Plaintiff,

    -against-

FASHION INSTITUTE OF TECHNOLOGY,
JOSEPH MAIORCA, Individually; ROBERTA
PALEY, Individually; ROBERTA DEGNORE,
Individually,

                 Defendants.

-------------------------------------------------------------------X

No. 1:21-cv-3878

**COMPLAINT**

Jury Trial Demanded

Plaintiff DAWNN KAREN MAHULAWDE, by and through her attorneys, the DEREK

SMITH LAW GROUP, PLLC, as and for her Complaint in this action, alleges as follows:

**NATURE OF THE CLAIMS**

1. This action is brought to remedy, *inter alia*, Defendants' unlawful employment discrimination on the basis of race and color against Plaintiff, along with a hostile work environment, and retaliation for Plaintiff's opposition to these unlawful practices.

2. Through their unlawful and discriminatory conduct, Defendants violated, *inter alia*, 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991 ("Section 1981"), New York State Human Rights Law, New York Executive Law § 290, *et seq*. (NYSHRL); and the New York City Human Rights Law, Administrative Code of the City of New § 8-107 et seq. ("NYCHRL").

**JURISDICTION, VENUE, and TIMELINESS**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action involves federal questions arising under Section 1981.

4. Defendants reside, are domiciled, or do continuous and substantial business within this District, subjecting them to this Court's personal jurisdiction.

5.  Venue is also properly laid in this District because Defendants reside, are domiciled, or do continuous and substantial business here, and because the events or omissions giving rise to Plaintiff's claims occurred here.

6.  On January 11, the Parties' respective counsel entered into a "Standstill Agreement" that tolled any applicable statutes of limitations while the parties attempted to negotiate a resolution of Plaintiff's potential claims.  Paragraph 3 of the Standstill Agreement states in part:  "If this Agreement is terminated by either party, Karen shall have, from the date such termination becomes effective, whatever time remained on each of Karen's Claims as of December 23, 2020."  The Parties' counsel ultimately agreed to extend this tolling arrangement through April 30, 2021.

## PARTIES

7.  Plaintiff is an African-American woman, who is 32 years old at the time of this writing.  She holds a Masters of Education in Counseling Psychology, and 70 credit hours toward a Master's in Counseling Psychology – both from Columbia University's Teachers College.

8.  Plaintiff has pioneered the field of "fashion psychology," the academic discipline studying how color, beauty, style, image, and shape affect human behavior, cultural sensitivities, and cultural norms.  Plaintiff has been profiled in the New York Times (which dubbed her the "Dress Doctor"), she has been quoted by the Guardian and several other prominent media outlets, and she has appeared in numerous other publications.

9.  Defendant Fashion Institute of Technology ("FIT") is the State University of New York (SUNY) college of art and design, business and technology, located at located at 227 West 27th Street in Manhattan.  At all relevant times, FIT met the definition of an "employer" under all applicable statutes.

10. FIT is, according to its website, "[o]ne of New York City's premier public institutions," and "an

internationally recognized college for design, fashion, art, communications, and business," that is "known for our rigorous, unique, and adaptable academic programming, experiential learning opportunities, academic and industry partnerships, and commitment to research, innovation, and entrepreneurship."

11. Defendant Joseph Maiorca is a white male coworker of Plaintiff's, and at all times material was employed by FIT as an Associate Professor in the Social Sciences Department.

12. Defendant Roberta Degnore is a white female coworker of Plaintiff's, and at all times material was employed by FIT as an Adjunct Professor in the Social Sciences Department.

13. Defendant Roberta Paley is a white female coworker of Plaintiff's, and at all times material was employed by FIT as an Associate Professor in the Social Sciences Department.

## FACTUAL ALLEGATIONS

14. In about April 2016, FIT's Social Sciences Department Chair, Paul Clement, asked Plaintiff to take over teaching a course titled "Psychology of Color" that semester.  Plaintiff agreed to do so and almost immediately commenced teaching the course.

15. The following fall, in the semester that started in late August 2016, Plaintiff also began teaching a course in general psychology.

16. Plaintiff worked for FIT pursuant to a collective bargaining agreement that her union, the United College Employees (UCE), Local 3457, had signed with FIT.

17. Plaintiff worked hard as a professor, and her student and faculty reviews and evaluations were consistently stellar.

18. In the fall of 2017, Social Sciences Department Assistant Chair Daniel Berkendorf, who oversaw FIT's psychology faculty, approached Plaintiff and suggested that she teach a course to be called "Fashion Psychology."  He indicated that FIT's Fashion Design Department wanted such a course

to be required for its student.

19. Plaintiff accordingly submitted a formal course proposal to Berkendorf, who approved it; the next step in the process for creating a new course offering was for the approved proposal to be circulated to all members of the Social Sciences Department for comment.

20. Plaintiff accordingly circulated her proposal to the Social Sciences Department for comment.

21. Apparently any member of the Department could block the course creation.  Maiorca and Paley apparently did not like the course proposal and blocked it – but refused Plaintiff's repeated requests to meet with them to discuss their critiques of her proposal.

22. Thereafter, Maiorca and Paley e-mailed their fellow Social Sciences Department rules for new course approval – they expressly called it the "Dawnn Policy."

23. The "Dawnn Policy" was that a professor needed a Master's Degree, plus 60 credit hours, plus at least two scholarly publications, in order to receive approval for a course.  Plaintiff met two of the three qualifications; but she lacked two scholarly publications.

24. Upon information and belief, both before and after this Dawnn Policy was approved, other professors – who are white – have had courses approved despite the fact that they did not have the requisite qualifications.

25. Accordingly, the new rule was, both in intent and enforcement, specifically meant to exclude Plaintiff from creating the course that she wanted to teach – and that members of another FIT department wanted her to teach.

26. So Plaintiff kept teaching only "Psychology of Color."

27. On about February 12 and 13, 2018, Plaintiff e-mailed Maiorca and Paley again, asking them to meet with her.  Although both of them responded to the effect of "we'll get back to you," neither ever did.

28. The next day, February 14, 2018 a "senior auditor" (a retiree taking FIT classes for no credits) yelled at Plaintiff in front of the whole class that she did not want to hear the "black music" that Plaintiff had been playing at a low volume as background music while students worked on a project.  When Plaintiff responded that the student was being disruptive and she should show Plaintiff, her professor, respect, the student yelled "you're nobody!"  Severely upset, Plaintiff cancelled class for the day.

29. When Plaintiff complained about the incident to Berkendorf, he said the student was "probably triggered" by Plaintiff's relative youth and her race.  Plaintiff suggested that the "senior learner" made her uncomfortable and should take other classes if she was disturbed by having a younger Black professor.

30. On or about March 1, 2018, at a faculty meeting where the members were voting (anonymously) on whether to extend an offer to Plaintiff to continue teaching in the coming fall semester, Plaintiff received six "approve" votes, four "approve with reservations," and four "no" votes.  This was despite the fact that Plaintiff had a very high 5.1 average score (out of 6.0) on her most recent student evaluations as well only "good," "very good," and "excellent" faculty reviews.

31. Once the votes were tallied, Maiorca asked:  "Isn't this grounds for termination?"  The Department Chair, Paul Clement said no.

32. On about March 17, 2018, Plaintiff e-mailed a letter to Deliwe Kekana, FIT's Officer of Affirmative Action, complaining about Maiorca's and Paley's mistreatment, and suggesting that it (specifically their creation of the "Dawnn Policy") was motivated by racial bias.

33. In response to some questions that Kekana e-mailed on March 24, 2018, Plaintiff told her that Berkendorf had originally approved Plaintiff's proposed course, and that she had had the necessary credentials to propose and teach the course.

34. Plaintiff then met with Kekana on April 4, 2018 to further discuss her allegations.  Kekana informed Plaintiff that "we are backed up with complaints about racial discrimination," and "hopefully we can get to your complaint by this summer."

35. On about April 10, 2018, Jerilee Fonseca, FIT's Administrative Assistant for Affirmative Action, asked Plaintiff whether she wanted to remain confidential; Plaintiff said she did.

36. On April 15, 2018, Degnore, e-mailed the Social Sciences Department, voicing outrage that Plaintiff had claimed that there was racial bias within the Department.

37. In other words, someone within the Office of Affirmative Action, which was supposed to assist Plaintiff and protect her from retaliation, had "outed" her complaints to the Department.

38. Praveen Chaundry, another professor, forwarded the e-mail to Clement, agreeing with Plaintiff that there was significant racial bias within FIT's Social Sciences Department.

39. At another faculty meeting two days later (on April 17, 2018), Paley stood up in the meeting and berated Plaintiff for filing a discrimination claim against them with the Affirmative Action Office.

40. Degnore then accosted Plaintiff; standing inches from Plaintiff's face, she yelled:  "How dare you say we're racists!  The New York Times said you're a 'dress doctor,' but you don't even have a PhD!  How can you say we're racists, you don't teach fashion psychology?  How are we being racist toward you?  You didn't create fashion psychology, someone at the London College of Fashion did!"

41. Feeling physically threatened, Plaintiff left the room.  Behind her, Chaudry warned the rest of the faculty members in the meeting that Plaintiff now had grounds for a lawsuit.  And Clement said: "We should have kept this out of the meeting, this was supposed to be confidential.  We should let Affirmative Action handle this?"  Plaintiff then heard Maiorca, Paley, and Degnore commenting, while they left the room, about how she (Plaintiff) was not even a PhD, but she was Black, and

they had to find a way to vote her off the faculty.

42. Plaintiff regained her composure, and then went to teach her next class.

43. Later that day, Plaintiff, Chaudry, and Clement each e-mailed Kekana, describing what had occurred.  Plaintiff expressly stated to Kekana that she was being retaliated against.

44. Later that same day, after Plaintiff entered an elevator, Degnore ran into the elevator car, stood right in front of Plaintiff, and looked her up and down menacingly, while they rode down six floors.

45. Thereafter, on several occasions, Plaintiff visited FIT's Employee Assistance Program (EAP) staff, for counseling.

46. That fall, on about September 6 and 21, 2018, Plaintiff sent follow-up e-mails to Kekana, asking what was happening with Affirmative Action's investigation into her complaint.   Kekana responded to the second e-mail to state that "we're still investigating."

47. On or about October 3, 2018, students began e-mailing Plaintiff, asking why her courses had disappeared from the registrar's online list of upcoming spring semester courses.  Assuming this was a further act of retaliation, Plaintiff reported it to Kekana; but upon information and belief, the Affirmative Action staff never investigated this incident.  Ultimately, after Plaintiff reported this incident to Clement too, the courses were returned to the registrar's list.

48. However, on about October 4, 2018, the Affirmative Action office instructed the Social Sciences Department to rescind its recently instituted new course requirements – i.e., the "Dawnn Policy."

49. Accordingly, on about October 17, 2018, Clement e-mailed the entire Social Sciences Department that Plaintiff would be allowed to propose her fashion psychology course at a faculty meeting.

50. At another faculty meeting sometime in early November, Paley and Degnore berated Chaudry (in front of Plaintiff) for rating Plaintiff as "excellent" in his faculty review.  Degnore then essentially reiterated her prior gripes that "fashion psychology is not a real field," "her proposal wasn't given

to anyone for review" (but it was), "she doesn't own this field."

51. Chaudry responded that their comments were irrelevant to his evaluation of Plaintiff's teaching abilities.  Degnore then stood up, stood next to Plaintiff, put her finger in Plaintiff's face and yelled "how can we be racists?!"  Plaintiff responded:  "Dan Berkendorf said in a faculty meeting that there is some implicit racism in this Department."  At that point Clement again asked everyone to "let Affirmative Action handle this."

52. On December 13, 2018, Plaintiff made her course proposal at another Social Sciences Department faculty meeting.  The faculty voted overwhelmingly to turn down Plaintiff's course proposal.

53. The following semester, at a faculty meeting on about March 5, 2019, Degnore raised a proposal that she would take over teaching both of Plaintiff's "Psychology of Color," classes.  Upon information and belief, Degnore was doing this to remove Plaintiff from the FIT faculty.  A majority of the Department voted in favor of the proposal.  Plaintiff was thus relegated to teaching one General Psychology course per semester, instead of her previous three courses.  Plaintiff's pay was based on how many course hours she taught; so as a result of Degnore taking away two of her classes, Plaintiff's pay was reduced by approximately two thirds.

54. On June 6, 2019, Plaintiff e-mailed Kekana again asking for an update on the investigation into her claims; Kekana again informed Plaintiff that they were still investigation.

55. That fall, on about October 28, 2019, Fonseca e-mailed Plaintiff that the Affirmative Action investigation had concluded, and that Plaintiff should meet with Kekana, Fonseca, and her union representative.  But the first time Kekana and Fonseca ended up being available to meet Plaintiff was on January 29, 2020.

56. At the January 29 meeting, they informed Plaintiff that although her work environment was "hostile," they had concluded that there had been no discriminatory motive behind any of her

mistreatment, so they were referring the matter to FIT's Human Resources Department.

57. Upon information and belief, the Affirmative Action staff did not fully and fairly investigate Plaintiff's claims, they merely whitewashed them.

58. During February 2020, at New York's annual "Fashion Week," FIT presented a fashion show wherein models dressed as monkeys and in exaggerated blackface-type masks.

59. On February 23, 2020, the New York Times published an article describing that fashion show and discussing the controversy it had triggered within FIT's faculty and student body.

60. Meanwhile, on February 12, 2020, Plaintiff presented a lecture in which she discussed the psychology of the "hoodie" as worn by Trayvon Martin, the Black teen killed by a white security guard.

61. That lecture was being watched by another FIT professor, George Francisco, who was supposed to give Plaintiff a faculty evaluation.  He later refused to give Plaintiff any rating, writing on her evaluation that she was completely incompetent, that race and Trayvon Martin's hoodie had nothing to do with psychology, and that the topic was irrelevant.

62. Plaintiff wrote a rebuttal, noting that she had presented the same lecture in prior years, and that the subject was particularly topical during Black History Month and in the wake of the FIT fashion show.  In particular, Plaintiff had presented the same lecture on about February 20, 2019, and it had been reviewed as "excellent" by another faculty member, Bertrand Gordon.  In response, Francisco changed his evaluation to "satisfactory."  But Plaintiff wanted to receive an "excellent" rating, and deserved one, so she asked for a second evaluation.

63. As a result, Plaintiff was re-evaluated by another faculty member, Kim Cunningham, roughly one week later; Cunningham rated Plaintiff as "excellent."

64. At the next Social Science Department faculty meeting to discuss Plaintiff's reappointment, on or

about March 5, 2020, Francisco appeared and spoke about how poorly Plaintiff had performed. Cunningham did not appear at the meeting to defend Plaintiff's performance; but she texted Plaintiff to state that she was afraid of retaliation if she publicly contradicted Francisco.

65. Degnore then stood up and seconded Francisco. She asked the attendees: "Why is she teaching color psychology? What does Trayvon Martin have to do with color psychology? And Black history, what does it have to do with color psychology? It shouldn't be taught in the color psychology context."

66. Another professor, Lucy Payne, then asked: "why do we keep doing this to Dawnn?"

67. Plaintiff was asked to leave the room for the vote. From outside, she could hear professors yelling at each other – some questioning why Plaintiff (alone) was constantly having her credentials and abilities questioned, given her good student and faculty evaluations.

68. When Plaintiff returned to the room, the vote tally was revealed to her:  7-7, meaning she did not pass, and could not return to teach the following semester.

69. Upon hearing that Plaintiff's teaching contract had not been renewed, FIT's "Undergraduate Association" began publicizing what had happened on social media; they also contacted the same New York Times columnist who had previously covered FIT's fashion show controversy, and informed her of what had happened. The New York Times ultimately published an article on about March 16, 2020, describing what had happened to Plaintiff.

70. Fearful of further bad publicity, FIT was given back her teaching position and full courseload, beginning in the Fall 2020 semester.

71. Meanwhile, to the best of Plaintiff's knowledge, no other similarly situated non-African-American professor at FIT was subjected to similar behavior.

72. The above are just some examples of the unlawful harassment, discrimination, and retaliation to

which Defendants subjected Plaintiff.

73. As a result of Defendants' unlawful and discriminatory actions, Plaintiff feels humiliated, degraded, victimized, embarrassed, and emotionally distressed, and has endured depression, anxiety, and physical ailments, and the exacerbation of preexisting conditions.

74. As a result of Defendants' unlawful discriminatory and retaliatory actions, Plaintiff has also endured financial hardships and irreparable damage to her professional reputation, and has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails.

75. Alternatively, in the event Defendants claim or the Court determines that Plaintiff is an independent contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to independent contractors.

76. Plaintiff also claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

77. Plaintiff hereby demands equitable relief in the form of approval of her Fashion Psychology course, being placed on a tenure track position, and the imposition of a formal, structured, and transparent course approval process.

## FIRST CAUSE OF ACTION
## 42 U.S.C. § 1981 – DISCRIMINATION
### (Against FIT Only)

78. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

79. 42 U.S.C. § 1981 states in pertinent part:  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is

enjoyed by white citizens."

80. As a result of FIT's discrimination in violation of Section 1981, Plaintiff has been denied the enjoyment of all benefits, privileges, terms, and conditions of her contractual relationship, specifically the privileges of her collective bargaining agreement, which provided substantial compensation and benefits, thereby entitling her to injunctive and monetary relief.

## SECOND CAUSE OF ACTION
## NYSHRL – DISCRIMINATION
### (Against FIT Only)

81. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

82. The NYSHRL provides in pertinent part: "1. It shall be an unlawful discriminatory practice:  (a) For an employer . . . , because of an individual's . . . race, . . . color, [or] national origin, . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296.

83. FIT engaged in an unlawful discriminatory practice in violation of this provision by discriminating against Plaintiff because of her race or color.

84. Plaintiff suffered damages as a result, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## NYSHRL – AIDING/ABETTING/INCITING/COMPELLING/COERCING
### (Against All Defendants)

85. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

86. The NYSHRL provides in pertinent part:  "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article,

or to attempt to do so." N.Y. Exec. Law § 296(6).

87. Each Defendant engaged in an unlawful discriminatory practice in violation of this provision by aiding, abetting, compelling, and/or coercing the other Defendants' discriminatory behavior as stated herein.

88. Plaintiff suffered damages as a result, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### NYSHRL – RETALIATION
### (Against FIT Only)

89. Plaintiff repeats and re-alleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

90. The NYSHRL provides in pertinent part that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article." N.Y. Exec. Law §296(7).

91. Defendants engaged in an unlawful discriminatory practice in violation of this provision by wrongfully retaliating against the Plaintiff because she complained of their race-based hostile work environment and discrimination, particularly after she contacted the DHR and filed a charge of discrimination.

92. Plaintiff suffered damages as a result, in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### NYCHRL – DISCRIMINATION
### (Against All Defendants)

93. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

94. The NYCHRL makes it an unlawful discriminatory practice: "For an employer or an employee or

13

agent thereof, because of the actual or perceived age, race, creed, color, national origin, . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).

95. Defendants engaged in an unlawful discriminatory practice in violation this provision by creating and maintaining discriminatory working conditions and unfairly harassing Plaintiff when similarly situated but non-African-American employees were not treated similarly, and by otherwise discriminating against the Plaintiff as set forth herein.

96. Plaintiff suffered numerous damages as a result, in amounts to be determined at trial.

### SIXTH CAUSE OF ACTION
### NYCHRL – RETALIATION
### (Against All Defendants)

97. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

98. The NYCHRL makes it an unlawful discriminatory practice:  "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter . . . ."  N.Y.C. Admin. Code § 8-107(1)(e).

99. Each Defendant violated this provision by discriminating against Plaintiff because she opposed Defendants' unlawful employment practices, including through her repeated complaints to Defendants about the unlawful discrimination and harassment to which she had been subjected.

100. Plaintiff suffered numerous damages as a result, in amounts to be determined at trial.

### SEVENTH CAUSE OF ACTION
### NYCHRL – AIDING AND ABETTING
### (Against All Defendants)

101. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint as if fully set forth herein.

102.  The NYCHRL makes it an unlawful discriminatory practice:  "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so." N.Y.C. Admin. Code § 8-107(6).

103.  Each Defendant violated this provision by aiding, abetting, inciting, compelling, or coercing the above discriminatory, unlawful, and retaliatory conduct by the other Defendants.

104.  Plaintiff suffered numerous damages as a result, in amounts to be determined at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements; and for permanent equitable and injunctive relief; and for such other relief as the Court deems just and proper.

**JURY DEMAND:**  Plaintiff demands a trial by jury as to all issues so triable.

Date:  April 30, 2021
       New York, New York

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

BY:  */s/ Daniel S. Kirschbaum*
     Daniel Kirschbaum, Esq.
     One Pennsylvania Plaza, 49th Floor
     New York, New York 10119
     (212) 587-0760

     *Attorneys for Plaintiff*